**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                  Case No.  3:09-cr-79(S1)-J-34JRK

CLIFFORD B. WILBUR

_____/

## REPORT AND RECOMMENDATION[1]

    This cause is before the Court on the Motion to Suppress and Citation of Authority (Doc. No. 68; "Motion") filed by Defendant on January 5, 2010.  The Motion is opposed.  <u>See</u> United States' Memorandum Opposing Defendant Clifford Wilbur's Motion to Suppress (Doc. No. 70; "Response"), filed January 8, 2010.  In the Motion, Defendant seeks to suppress all evidence obtained as a result of a traffic stop that occurred on May 6, 2008.  <u>See</u> Motion at 2.  Defendant contends that the evidence obtained during the traffic stop should be suppressed for three reasons: (1) the initial traffic stop of Defendant's vehicle ("Vehicle") was unlawful; (2) the duration and scope of the traffic stop were expanded impermissibly; and (3) the search of the Vehicle was conducted without a warrant, and probable cause to search Defendant's Vehicle was lacking.

    For the reasons explained herein, the undersigned finds (1) the initial stop of the Vehicle was lawful because the officer conducting the stop had probable cause to believe that a traffic infraction was being committed; (2) the duration and scope of the stop were not

---

[1] During the hearing held on January 8, 2010, the parties agreed, as memorialized by the Order entered on January 10, 2010 (Doc. No. 72), that objections to this Report and Recommendation are due within six days after it is docketed, and responses are due four days thereafter.  <u>See</u> Order (Doc. No. 72) at 1-2.

expanded impermissibly; and (3) the search of the Vehicle was lawful because probable cause was established by the positive alert of a narcotics-detection canine. Accordingly, the undersigned recommends that the Motion be denied.

## I.  Background

On March 18, 2009, a federal grand jury returned an Indictment (Doc. No. 1) charging Defendant with one count of distribution of cocaine base (commonly known as "crack") and one count of possession with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C).  On March 25, 2009, Defendant was arrested by federal authorities, and he made his initial appearance in federal court that same day. See Minute Entry (Doc. No. 6).  On March 30, 2009, Defendant was arraigned and pleaded not guilty. See Minute Entry (Doc. No. 17).  On July 8, 2009, a Superseding Indictment (Doc. No. 31) was filed, charging Defendant with two counts of distribution of crack cocaine and one count of possession with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C).  On July 14, 2009, Defendant was rearraigned and pleaded not guilty. See Minute Entry (Doc. No. 34).  On January 5, 2010, the instant Motion was filed.  On January 8, 2010, the undersigned held a scheduling hearing on the Motion. See Minute Entry (Doc. No. 71).

## II.  Testimony/Exhibits

The evidentiary hearing on the Motion was held January 20, 2010, at which the Government offered the testimony of three officers of the St. Johns County Sheriff's Office:

Deputy Russell Martin; Detective Eugene Tolbert;[2] and Deputy Steve Gazdick.  See Minute

Entry (Doc. No. 74).  Defendant testified on his own behalf.  See id.  The relevant testimony

is summarized below.

### A. Deputy Russell Martin

Deputy Martin testified as follows.  Deputy Martin was employed by the Wise County

Sheriff's Office in Virginia for eight years before he moved to Florida.  While working for the

Wise County Sheriff's Office, Deputy Martin was assigned to road patrol before being

promoted to the canine division.  On April 1, 2007, Deputy Martin began working for the St.

Johns County Sheriff's Office.  Since that time, Deputy Martin has been assigned to patrol

duty in particular zones of St. Johns County, Florida.

On May 6, 2008, Deputy Martin was on patrol duty in zone six of St. Johns County,

which is commonly referred to as the King Street area.  The King Street area has been

federally designated a "weed and seed" area due to the high crime rate.  At approximately

12:30 p.m., Deputy Martin was traveling east on West King Street.  According to Deputy

Martin, the weather that day was partly cloudy; it was not raining, and the sun was shining.

As he approached the intersection at North Rodriguez Street, he observed a tan Mazda 626,

the Vehicle at issue, traveling in the opposite direction.  Just prior to seeing the Vehicle,

Deputy Martin had stopped his patrol car to talk to Deputy Tolbert.  Deputy Martin specifically

noticed that the Vehicle had "extremely dark tinted windows."[3]  After noticing the dark

---

[2] At the time of the traffic stop leading to Defendant's arrest, Detective Tolbert was a Deputy.  Therefore, he will be referred to as Deputy Tolbert hereinafter.

[3] Florida law requires a driver's windows to have "a light transmittance of at least 28 percent in the visible light range" and rear windows to have "a light transmittance of at least 6 percent in the visible light range." Fla. Stat. §§ 316.2953-316.2954.

windows on the Vehicle, Deputy Martin executed a U-turn and informed Deputy Tolbert by Nextel[4] that Deputy Martin intended to stop the Vehicle. The Vehicle turned right onto McLaughlin Street. Deputy Martin pulled behind the Vehicle and activated his lights. The Vehicle turned right onto Railroad Street and stopped.[5] Deputy Martin pulled behind the Vehicle at a "tactical" forty-five degree angle. Deputy Martin then radioed the dispatcher to report he was making a traffic stop, although the testimony was unclear precisely when the radio call was made. Deputy Martin was unable to remember whether he ran a check of the license tag of the Vehicle before or after it stopped.

After the Vehicle stopped, Defendant exited the Vehicle. Deputy Martin exited his patrol car and approached Defendant. The two spoke near the rear of the Vehicle. Defendant appeared to Deputy Martin to be anxious; that is, Defendant approached Deputy Martin, was pacing back and forth, was very talkative, and was "overly apologetic." According to Deputy Martin, Defendant acknowledged that the tinting on the windows was "pretty dark," and Defendant indicated that he would remove the tinting. Deputy Martin then asked Defendant's name and retrieved a "tint meter" from his patrol car. Deputy Tolbert arrived while Deputy Martin was speaking with Defendant.

During the January 20, 2010 suppression hearing, Deputy Martin demonstrated how a tint meter is operated using the same tint meter he used on May 6, 2008. According to

---

[4] Unlike the calls made to the police dispatcher by radio, there are no records of the Nextel communications.

[5] Deputy Martin testified that the distance from the place he executed the U-turn to where the Vehicle stopped on Railroad Street off of North McLaughlin Street is approximately one mile.

Deputy Martin, it took approximately five seconds to obtain a reading using the tint meter.[6]

Deputy Martin explained that the tint meter was signed out to Deputy Tolbert because there was one tint meter assigned to the shift, and Deputy Tolbert was the Assistant (or Acting) Shift Leader ("ASL").[7] Nonetheless, different officers would take turns using the tint meter. Deputy Martin testified that, although he was unsure when he took possession of the tint meter, he had it at the time of the stop of the Vehicle on May 6, 2008.

After retrieving the tint meter from his patrol car, Deputy Martin measured the tint of the windows of the Vehicle and verified that they did not comply with Florida law.[8] The front windows of the Vehicle tested at fifteen percent light transmittance; the rear windows tested at two percent light transmittance. Deputy Martin explained that a tint which allows only two percent light transmittance is referred to as "limo tint" because it is almost impossible to see through the windows even when standing next to them—they are "near black." After taking the tint meter reading, Deputy Martin asked Defendant for his driver's license. According to Deputy Martin, the stop at this point had lasted approximately five minutes.

Because of the way Defendant was acting, Deputy Martin decided to request a narcotic-detection canine unit. However, when he mentioned this to Deputy Tolbert, he discovered that Deputy Tolbert had already made a canine request to Deputy Gazdick[9] using

---

[6] Deputy Martin testified that, in addition to the five seconds it took to obtain a reading with the tint meter, Deputy Martin spent time retrieving the tint meter from his patrol car and approaching the Vehicle to take a reading.

[7] The ASL is the designation given to the officer who supervises and makes decisions when the Sergeant is unavailable.

[8] Government's Exhibit No. 10 is a Certificate of Accuracy for the tint meter.

[9] As explained infra pp. 11-12, Deputy Gazdick's dog Aron was trained to detect certain narcotics.

Nextel, and that Deputy Gazdick was on his way from an area called the "Bottoms," approximately one mile away.

Deputy Martin then conducted computer checks to determine the status of Defendant's driver's license and whether there were outstanding warrants for his arrest. Deputy Gazdick arrived while Deputy Martin was conducting these computer checks; Deputy Martin was surprised by how quickly Deputy Gazdick arrived. Deputy Martin requested that Deputy Gazdick conduct an exterior "sniff" of the Vehicle using his narcotic-detection canine. Deputy Gazdick conducted the sniff of the Vehicle contemporaneous with Deputy Martin performing the computer checks and preparing a warning citation for the window tinting. Deputy Martin testified that it typically takes about four to five minutes to run the computer checks, but it could take as long as ten minutes. The computer checks revealed that Defendant's driver's license was valid, and there were no outstanding arrest warrants. Deputy Martin then wrote the warning citation for the window tinting. It typically takes between ten and fifteen minutes to issue a citation, in addition to the time that is usually spent communicating with the dispatcher and other officers.

While Deputy Martin was finishing the routine computer checks and issuing the warning citation, the narcotic-detection canine gave a positive alert on the Vehicle. Deputy Tolbert searched the Vehicle and discovered 16.8 grams of a waxy substance, which field testing determined to be crack cocaine. Defendant was arrested. The search of the Vehicle was already ongoing by the time Deputy Martin finished issuing the warning citation. Defendant was given the warning citation for the window tinting after he was arrested. See

Govt's Exh. No. 9 (Warning Citation).[10]  Deputy Martin did not remember whether he gave Defendant's driver's license back to him prior to the search of the Vehicle, but he testified that he would not have given the driver's license back to Defendant before the computer checks had been completed.  According to Deputy Martin, from the time of the initial stop of the Vehicle to the time he issued the warning citation, approximately fifteen minutes elapsed.

Deputy Martin explained that the computer system used to issue traffic citations automatically stamps the date and time on them.  The time is set at the time the computer system is opened to issue the citation, so the time of the citation is set before any other information is inputted into the system.  Here, the time on the citation is 12:30 p.m.  See Govt's Exh. No. 9.  However, the time on the Offense Report is 12:36 p.m.  See Deft's Exh. No. 1 (Offense Report).  Deputy Martin testified that this discrepancy is explained by the fact that the times on the Offense Report are based on the Call History Record, or "CAD," and these times are generated by the individual dispatchers who take the calls on the radio.  See Govt's Exh. No. 8 (Call History Record).[11]  In contrast, the time on the citation is determined by the computer in the patrol car.  In other words, the computer which generates the citation is not part of the CAD system, and therefore the times are not synchronized.  Deputy Martin testified that he did not specifically recall when he started to write the warning citation; it was possible he opened the system to issue the warning citation immediately when he arrived on the scene.

---

[10]  The Warning Citation indicates that the light transmittance of the driver's side front window was 15%, and the light transmittance of the driver's side rear window was 2%.  See Govt's Exh. No. 9.

[11]  The process by which the CAD reports are generated, and why the information in them may not be completely accurate all of the time, was further explained by Deputy Tolbert infra p. 10.

Deputy Martin acknowledged that the CAD report does not reflect Deputy Tolbert's arrival on the scene. See Govt's Exh. No. 8. In addition, the CAD report reflects a change at 12:45 from "traffic stop in progress" to "traffic stop." Id. Deputy Martin was not sure what this meant. He explained that the CAD reports are generated by information entered by the dispatchers, which he does not control.

## B. Deputy Eugene Tolbert

Deputy Tolbert testified as follows. Deputy Tolbert has been employed with the St. Johns County Sheriff's Office since July 2001. In May 2008, Deputy Tolbert was an ASL assigned to patrol duty in zone six. On May 6, 2008, Deputy Tolbert and Deputy Martin were working patrol duty together in zone six, as they often did during that time period. Deputy Tolbert and Deputy Martin stopped to talk to each other several times that day; prior to the stop of the Vehicle, they had stopped to talk to each other at an old warehouse at the corner of Rodriguez Street and Evergreen. After they parted ways,[12] Deputy Tolbert received a communication from Deputy Martin via Nextel. Deputy Martin informed Deputy Tolbert that Deputy Martin was going to stop a car near McLaughlin Street. Deputy Tolbert explained that he communicated with Deputy Martin and other officers using Nextel rather than the police radio because Nextel is more efficient, and people in the King Street area often use police scanners to monitor the police radio.[13] When he received the Nextel communication from Deputy Martin, Deputy Tolbert was at the corner of King Street and Park Avenue, which

_____

[12] On cross-examination, Deputy Tolbert acknowledged the possibility that he may have conducted an unrelated traffic stop after this meeting with Deputy Martin, but Deputy Tolbert did not specifically remember such a stop.

[13] According to Deputy Tolbert, most of the officers on his shift shared a "chirp" Nextel number that they used to communicate with each other.

Deputy Tolbert estimated to be one-half mile from McLaughlin Street. Deputy Tolbert proceeded immediately to the location of the traffic stop. According to him, he arrived less than one minute later.

When Deputy Tolbert arrived at the scene, he saw Deputy Martin's patrol car parked behind Defendant's Vehicle. Deputy Martin was walking back to his patrol car, and Defendant was "milling about." Deputy Tolbert exited his patrol car and spoke to Deputy Martin. Deputy Tolbert testified that there was a "very high likelihood" he told Defendant to stand in a yard nearby.[14] Without consulting Deputy Martin, Deputy Tolbert contacted Deputy Gazdick using Nextel and requested a dog sniff.[15] Deputy Gazdick stated that he was en route from the Bottoms. Deputy Gazdick arrived at the scene approximately four to five minutes later.

When Deputy Gazdick arrived, Deputy Martin was in his patrol car. Deputy Tolbert directed Deputy Gazdick to the Vehicle. In Deputy Tolbert's opinion, Defendant seemed to be anxious, and his anxiety increased when the canine arrived. Deputy Tolbert observed that Defendant was out of the Vehicle wringing his hands; Defendant was also talking on his cellular phone and stated, "Now they've got a dog." At some point, Deputy Mickler arrived; according to Deputy Tolbert, Deputy Mickler "just showed up." According to Deputy Tolbert, other than himself, the following officers were present at the scene of the stop: Deputy Martin; Deputy Gazdick and his canine; Deputy Mickler; and Deputy Mike Plott.

---

[14] Deputy Tolbert did not immediately recognize Defendant at that time; however, upon hearing Defendant's name, Deputy Tolbert remembered a previous conversation with Deputy Sid Mickler, the "weed and seed coordinator," in which Deputy Mickler stated that Defendant was involved in narcotics.

[15] As of the January 20, 2010 hearing, Deputy Tolbert estimated that Deputy Gazdick has been involved in at least one hundred of the traffic stops Deputy Tolbert has conducted.

Deputy Gazdick deployed his canine to conduct a sniff of the exterior of the Vehicle and reported that there was a positive alert. Deputy Tolbert then searched the Vehicle and discovered a bottle that contained a substance that field testing confirmed was crack cocaine. Defendant was arrested. According to Deputy Tolbert, Deputy Martin had not issued the window tinting warning citation prior to Defendant's arrest; in fact, Deputy Tolbert did not see Deputy Martin get out of his patrol car until after Defendant was in handcuffs.

Deputy Tolbert explained that one tint meter was assigned to the shift, and it had been assigned to him. However, from time to time, other officers would use the tint meter. Deputy Tolbert testified that on May 6, 2008, he did not have the tint meter. Deputy Tolbert does not remember whether Deputy Martin measured the Vehicle's windows with the tint meter after Deputy Tolbert arrived at the scene.

On cross-examination, Deputy Tolbert acknowledged that the CAD report reflected neither his arrival at the scene, nor the arrival of Deputy Gazdick. See Govt's Exh. No. 8. Deputy Tolbert stated that there are two possible explanations for these omissions: either Deputy Tolbert and Deputy Gazdick did not radio their arrival to the dispatcher; or the dispatcher was busy and neglected to input their arrival into the system. Deputy Tolbert explained that dispatchers sometimes are busy doing multiple tasks simultaneously, and therefore information is sometimes entered into the CAD system at a time after the radio transmission actually occurred, or not at all.

Later that day, at 4:22 p.m., Deputy Tolbert wrote a supplemental report regarding this incident using Deputy Martin's computer.  See Deft's Exh. No. 1 at 6.[16]  However, Deputy Tolbert did not write any reports that record the times during which he was at the scene of the stop.

Deputy Tolbert testified that he has conducted hundreds or thousands of traffic stops. According to Deputy Tolbert, the average stop for the traffic infraction of speeding lasts between five and fifteen minutes.

## C. Deputy George Stephen Gazdick

Deputy Gazdick testified as follows.  Deputy Gazdick began his career with the St. Johns County Sheriff's Office in March 1999.  He was assigned to patrol duty until January 2009, when he moved to the Special Victims Unit as a Detective.  In October 2002, Deputy Gazdick became certified as a canine deputy.  In March 2003, Deputy Gazdick began training with canine Aron.  Deputy Gazdick and Aron have 400 hours of "full service" training with an additional 216 hours of training in the detection of narcotics.  Aron is able to detect five different narcotic odors:  marijuana, powder cocaine, crack cocaine, methamphetamine, and heroin.  During the January 20, 2010 hearing, the parties announced orally on the record that they had entered into the following stipulation regarding canine Aron:

> The drug-sniffing dog named Aron used by Deputy Gazdick on May 6, 2008 was properly trained, reliable, and otherwise a qualified drug-trained canine.

---

[16]  The Supplemental Report states that Defendant exited the Vehicle of his own accord.  See Deft's Exh. No. 1 at 6.  This statement is based on information that was provided to Deputy Tolbert by Deputy Martin.

Deputy Gazdick on May 6, 2008 was a properly qualified drug canine handler and deployed Aron in a proper manner.[17]

On May 6, 2008, Deputy Gazdick received a Nextel call from Deputy Tolbert requesting a canine sniff. Deputy Gazdick was familiar with Deputy Tolbert because Deputy Gazdick had trained Deputy Tolbert, and Deputy Gazdick had worked with Deputy Tolbert and Deputy Martin for "years" prior to May 6, 2008. When Deputy Gadzick received the call, he made a note on paper that the time was 12:36 p.m. according to his Nextel phone. At the time of the call, Deputy Gazdick was in the Bottoms approximately one-half mile from the location where the Vehicle was stopped. Deputy Gazdick immediately traveled to the scene of the stop and arrived there within four minutes. It is Deputy Gazdick's normal practice to document the time he receives a call requesting a dog sniff, as well as the time he arrives on the scene, because he includes this information in his report.

When Deputy Gazdick arrived at the scene of the stop, the occupants[18] were outside of the Vehicle. Deputy Tolbert was already on the scene, and Deputy Martin was in his patrol car. Deputy Martin briefly indicated he needed the Vehicle to be checked, and Deputy Gazdick discussed with Deputy Tolbert what should be done. Deputy Gazdick then deployed canine Aron to conduct a sniff of the Vehicle. During the second pass of the Vehicle, Aron put his head up to the open window and gave a positive alert for the odor of narcotics.

---

[17] This stipulation appears to resolve Defendant's argument that Aron's training and reliability have not been established. See Motion at 4-5.

[18] Deputy Martin and Deputy Tolbert testified that Defendant was the sole occupant of the Vehicle. Deputy Gazdick was under the impression that there were two occupants. It appears this inconsistency is explained by Defendant's testimony, infra pp. 13-17, that Defendant's brother arrived at the scene and stood with Defendant in a nearby yard during the stop.

Deputy Gazdick testified that Deputy Plott was present at the scene, but Deputy Gazdick was unsure when Deputy Plott arrived. Deputy Gazdick was unsure whether Deputy Mickler or anyone else was at the scene.

### D. Clifford B. Wilbur

During the January 20, 2010 suppression hearing, Defendant testified on his own behalf as follows. In May 2008, Defendant was residing on Chapin Street in St. Augustine, Florida; he has lived in that area his entire life. Defendant admitted during the suppression hearing that he has three prior felony convictions, at least one of which involved the distribution of crack cocaine.

At approximately 12:00 p.m. on May 6, 2008, Defendant was at home "lounging." At 12:04 p.m., Defendant used his cellular phone to call his brother, who lived at the corner of McLaughlin Street and Railroad Street. Defendant is certain as to the time of the call because he reviewed records from T-Mobile, the cellular phone service provider. The records are in the possession of Defendant's previous attorney and were obtained for purposes of a previous state-court case that was dismissed. However, the records were not offered as evidence at the January 20, 2010 suppression hearing. According to Defendant, his previous attorney would not give the records to him because there is a dispute regarding attorney's fees for the previous case.

During the 12:04 phone call, Defendant spoke with his brother for less than one minute. Defendant's brother stated that he was at home changing clothes after having been to state court for a hearing regarding child support. At 12:07 or 12:08, Defendant departed in the Vehicle from his residence to visit his brother at his brother's residence. Defendant

testified that his brother's residence is no more than five to seven minutes from his own residence. On his way to his brother's residence, Defendant saw Deputy Tolbert at the corner of Rodriguez and King conducting a traffic stop of another automobile.[19]

Defendant proceeded west on King Street and passed Deputy Martin, who was traveling east. As the two passed, Deputy Martin stared at Defendant, as well as the Vehicle; they looked at each other "eye to eye." Defendant testified that there was a lot of traffic at that time, and the weather was very dark and overcast. Defendant saw Deputy Martin's patrol car turn around. Defendant proceeded to McLaughlin Street, which was "a couple of minutes" further, continuing on his way to his brother's residence. According to Defendant, based on the time of the phone call, the time Defendant departed from his own residence, and driving time, Defendant arrived at his brother's residence at 12:15.

When Defendant arrived at his brother's residence, he could tell that his brother was not home because his brother's truck and trailer were not there. Defendant turned onto Railroad Street to turn around and back out, when Deputy Martin pulled behind him and blocked him so that the patrol car was at a ninety degree angle with the Vehicle.[20] According to Defendant, at this point, there was no indication that he was being stopped by the officer. Then, Deputy Martin turned on his lights. Defendant moved his Vehicle farther onto Railroad Street, and Deputy Martin moved forward.

Defendant was confused by this sequence of events, so he exited the Vehicle. Deputy Martin had already exited his patrol car. Defendant asked why he was being blocked, and

---

[19] Defendant testified that he recognized Deputy Tolbert because the community is small and most officers are well known to the residents.

[20] Defendant explained that McLaughlin Street is narrow.

Deputy Martin responded that, based on his experience, the windows on the Vehicle looked as if they were too dark. According to Defendant, Deputy Martin went from window to window, walking around the Vehicle. Defendant testified that Deputy Martin did not use a tint meter at this time. Defendant informed Deputy Martin that the tinting was already on the windows of the Vehicle when he bought it, and Defendant stated that he would remove the window tinting if it was a problem.

Deputy Martin asked for Defendant's driver's license, which Defendant provided. Defendant was told that a citation would be issued, and then Defendant could leave. Deputy Martin returned to his patrol car for five to seven minutes; Defendant was leaning against the back of the Vehicle waiting for Deputy Martin. By this time it was at least between 12:20 and 12:22, at which point Deputy Martin approached Defendant and handed Defendant's driver's license back to him without saying anything. Deputy Martin returned to his patrol car, and "apparently, whatever he was doing in the car, he was still doing or it was still going on." At least ten minutes later, Deputy Tolbert and another officer arrived. At the point Deputy Tolbert arrived, Defendant used his cellular phone to call his brother to tell him that the police would not let Defendant leave. This call was placed while Defendant was leaning against the Vehicle sometime between 12:20 and 12:25.[21] During the ten minutes between the time Deputy Martin gave Defendant's driver's license back to him and the time Deputy Tolbert arrived, Deputy Martin was sitting in his patrol car, which was blocking the Vehicle, and Defendant was standing or leaning against the back of the Vehicle. Defendant spoke with his brother on the phone until his brother arrived at the scene. According to Defendant, his

---

[21] There are inconsistencies in Defendant's chronology of events.

brother arrived at approximately 12:30.  Defendant was waiting for a citation for the window tinting, but he did not receive one.

When Deputy Tolbert arrived, he spoke with Deputy Martin for a few minutes.  Deputy Tolbert then went to his patrol car, retrieved the tint meter, and handed it to Deputy Martin.  All three of the officers approached Defendant and asked him to lower his windows so that a reading could be taken with the tint meter, and Defendant complied.  At this point, it was between 12:35-12:40.  After the tint meter was used to measure the tint of the windows, two or three other officers arrived; then two or three more officers arrived.  Defendant testified that the road was crowded with police cars.  The officers conversed with each other.  During this time, Deputy Martin was not in his patrol car doing anything–he was talking with Deputy Tolbert and the other officers.  An officer, who was not Deputy Tolbert, told Defendant to stand in a yard nearby.  When Defendant asked why, he was told that they were waiting for a canine to arrive.  Defendant testified that, from the time of the initial stop to the time that Defendant was ordered to stand in the nearby yard, at least twenty to twenty-five minutes passed.

Deputy Gazdick arrived at least twenty-five minutes after the initial stop.  Defendant was still standing in a yard near the Vehicle waiting with his brother.  Defendant did not feel that he was free to leave during this time.  Deputy Gazdick guided the canine around the Vehicle three times.  The doors of the Vehicle were closed during the sniff.  The canine sat down and looked at the other officers.  It appeared to Defendant that the canine did not do anything, although he acknowledges that he has no training with respect to narcotic-detection canines.  A search of the Vehicle was conducted, which lasted less than two minutes, and

then Defendant was slammed to the ground and placed in handcuffs.  From the time of the initial stop to the time of the sniff, at least twenty-five minutes passed.

Defendant was transported to the St. Johns County Jail.  Sometime after he was booked into the County Jail, Defendant was informed that he was being charged with the possession of illegal drugs.  Defendant was not given a citation for the window tinting violation while he was at the scene; rather, he received the citation from Deputy Tolbert at least three hours after he was taken to the County Jail.

### III.  Summary of Argument

Defendant seeks suppression of the evidence obtained as a result of the search of the Vehicle.  Motion at 2.  First, Defendant contends that the initial stop of the Vehicle was not supported by "probable cause or a reasonable suspicion of criminal activity."  Id. at 2-5. Second, Defendant asserts that the duration of Defendant's detention was impermissibly prolonged, and that the dog sniff exceeded the lawful scope of the traffic stop.  See id. at 3-7. Defendant argued at the suppression hearing that, because Deputy Martin did not have a tint meter at the time he stopped the Vehicle, he did not have a "firm basis at the time to measure the tint," and the stop was prolonged to wait for a tint meter.  Also during the suppression hearing, Defendant contended that the officers were "working the system" through their knowledge of the law and use of Nextel phones.  Third, Defendant argues that the search of the Vehicle was conducted without a warrant, and probable cause did not exist to search

Defendant's vehicle because the sniff of the Vehicle was conducted by an unreliable canine. See id. at 4-5.[22]

The Government responds that Deputy Martin had probable cause or a reasonable suspicion that the window tinting on the Vehicle was illegal under Florida law, thus justifying the initial stop. See Response at 3-5.[23] The Government also asserts that Deputy Martin did in fact have a tint meter to measure the windows of the Vehicle at the time of the initial stop. See id. at 2. According to the Government, Deputy Martin did not impermissibly prolong the stop, and the dog sniff was lawful. See id. at 5-6. The Government contends that the alert of the narcotic-detection dog established probable cause to search Defendant's vehicle. See id. at 6-8.

### IV. Analysis

#### A. Credibility Determination

A review of the evidence presented during the suppression hearing reveals that the testimony of Deputy Martin is consistent with the testimony of Deputy Tolbert and Deputy Gazdick. However, the testimony of the officers conflicts in a number of material ways with the testimony of Defendant. In addition, Defendant's past felony convictions weigh against his credibility. See Fed. R. Evid. 609; Eleventh Circuit Pattern Jury Instructions, No. 6.4. Moreover, there are internal inconsistencies in the testimony of Defendant, and there is no documentary evidence indicating that the stop occurred as early as Defendant asserts. After

---

[22] As noted earlier, the argument that the canine was unreliable appears to have been resolved by the stipulation of the parties during the suppression hearing.

[23] The Government does not contend that Defendant lacks standing to challenge the initial stop of the vehicle.

hearing the testimony of the witnesses, observing their demeanor, and considering the other evidence, the undersigned credits the testimony of Deputy Martin, Deputy Tolbert, and Deputy Gazdick where inconsistent with the testimony of Defendant.

### B. Initial Traffic Stop

Defendant argues that the initial stop of the Vehicle was not supported by probable cause or a reasonable suspicion of criminal activity. Motion at 2, 4-5. "Traffic stops qualify as seizures under the Fourth Amendment." United States v. Ramirez, 476 F.3d 1231, 1236 (11th Cir. 2007) (citation omitted). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). In addition, an investigatory stop of a vehicle is permissible under the Fourth Amendment if an officer has reasonable suspicion that criminal activity is afoot. See Terry v. Ohio, 392 U.S. 1 (1968); see also United States v. Nunez, 455 F.3d 1223 (11th Cir. 2006) (holding that an investigatory stop of a vehicle was lawful because officers had reasonable suspicion that the occupants of the vehicle were involved in criminal activity). Thus, "a traffic stop is a constitutional detention if it is justified by reasonable suspicion under Terry or probable cause to believe that a traffic violation has occurred under Whren . . . ." United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003). In Florida, it is a noncriminal traffic infraction to operate a motor vehicle on a public road if the windows of the vehicle are covered by or treated with any product that reduces the light transmittance of the driver's side windows beyond twenty-eight

percent or the light transmittance of the rear windows beyond fifteen percent. <u>See</u> Fla. Stat. §§ 316.2953 and 316.2953.[24]

Here, the initial stop of the Vehicle was lawful. Deputy Martin testified that, as he passed the Vehicle, he specifically noticed that its windows were "extremely dark." Deputy Martin has sufficient experience as a law enforcement officer to enable him to recognize window tinting that violates Florida law. Deputy Martin explained that the percentage of light transmittance of the rear window tinting was in the range of "limo tint," which is "near black." The undersigned finds that Deputy Martin had probable cause to believe that the window

---

[24] Section 316.2953 of the Florida Statutes governs front windows:

A person shall not operate any motor vehicle on any public highway, road, or street on which vehicle the side wings and side windows on either side forward of or adjacent to the operator's seat are composed of, covered by, or treated with any sunscreening material or other product or covering which has the effect of making the window nontransparent or which would alter the window's color, increase its reflectivity, or reduce its light transmittance, except as expressly permitted by this section. A sunscreening material is authorized for such windows, if, when applied to and tested on the glass of such windows on the specific motor vehicle, the material has a total solar reflectance of visible light of not more than 25 percent as measured on the nonfilm side and <u>a light transmittance of at least 28 percent in the visible light range</u>. A violation of this section is a noncriminal traffic violation, punishable as a nonmoving violation as provided in chapter 318.

Fla. Stat. § 316.2953 (emphasis added).

Section 316.2954 of the Florida Statutes governs rear windows:

(1) A person shall not operate any motor vehicle on any public highway, road, or street on which vehicle any windows behind the driver are composed of, covered by, or treated with any sunscreening material, or other product or material which has the effect of making the window nontransparent or which would alter the window's color, increase its reflectivity, or reduce its light transmittance, except as specified below:

(a) Sunscreening material consisting of film which, when applied to and tested on the rear window glass of the specific motor vehicle, has a total solar reflectance of visible light of not more than 35 percent as measured on the nonfilm side and <u>a light transmittance of at least 15 percent in the visible light range</u>; however, sunscreening material which, when applied to and tested on the rear window glass of the specific motor vehicle, has a total solar reflectance of visible light of not more than 35 percent as measured on the nonfilm side and a light transmittance of at least 6 percent in the visible light range may be used on multipurpose passenger vehicles. . . .

(3) A violation of this section is a noncriminal traffic violation, punishable as a nonmoving violation as provided in chapter 318.

Fla. Stat. § 316.2954 (emphasis added).

-20-

tinting violated Florida law, thus justifying the initial stop of the Vehicle for the window tinting infraction. Cf. United States v. Pena-Ponce, 588 F.3d 579, 583 (8th Cir. 2009) (finding that probable cause to stop a truck for illegal window tinting was established by an officer's belief, based on his training and experience, that the window tinting violated state law, which belief was confirmed with a tint meter the next day, after the defendant had been arrested for drug possession); United States v. Weaver, 145 F. App'x 639, 641-42 (11th Cir. 2005) (unpublished) (finding probable cause when a law enforcement officer "observed [the d]efendant's vehicle and suspected that the vehicle's window tint violated Florida law because the Deputy's headlights reflected on it," and the Deputy "could not see the driver's silhouette nor the dashboard lights through the tinted windows although he was only five feet away"); United States v. Harrell, 268 F.3d 141, 148-49 (2d. Cir. 2001) (finding probable cause, despite the testifying officer's "vaccillat[ion] on this issue," because "an 'objectively reasonable' officer would have suspected the windows were tinted in violation of" state law when the historical facts of the case were that an officer observed that the car's windows were tinted as the officer drove past the car, and the officer "purposefully looked into the car"); see also United States v. Gonzalez, No. 2:09-cr-29-FtM-29SPC, 2009 WL 3230787 (M.D. Fla. Oct. 2, 2009) (unpublished) (finding that an officer had probable cause to stop an automobile for illegally tinted windows when the officer "could not see inside the vehicle when it passed by his position," and the officer had made hundreds of stops for illegal window tinting).

Defendant, based on his own testimony, contends that the initial stop of the Vehicle was impermissible because Deputy Martin did not have a tint meter. However, the

undersigned credits the testimony of Deputy Martin, as corroborated by the testimony of Deputy Tolbert, that Deputy Martin had in his possession a tint meter, which he used to measure the tint of the Vehicle's windows to verify that the tint violated Florida law. <u>See</u> <u>supra</u> p. 18-19. While the undersigned finds Defendant's argument to be unfounded as a factual matter, it is also legally unsound. Defendant is confusing the standard for probable cause to believe that a violation has occurred with that for <u>proof</u> of a violation. <u>See</u> <u>Weaver</u>, 145 F. App'x 641-42 (emphasis added).

In <u>Weaver</u>, the Eleventh Circuit determined in an unpublished opinion that a traffic stop was lawful because the officer had probable cause to believe the Florida window tinting statute was being violated. <u>Id.</u> at 642. During the stop, the officer became suspicious because the defendant behaved nervously and gave two false names. <u>Id.</u> at 640. After the defendant consented to a search of the automobile, crack cocaine was found, and the defendant was arrested. <u>Id.</u> The next morning, the light transmittance of the window was measured, and it was determined to be nineteen and one-half percent, "well below the lowest statutory allowance of 28 percent." <u>Id.</u>

The defendant in <u>Weaver</u> argued that "an officer cannot stop a vehicle solely on the basis of the window-tint statute without knowing the vehicle's exact light transmittance percentage." <u>Id.</u> at 641. The Eleventh Circuit rejected this argument, explaining that "probable cause requires less support than that necessary for a conviction." <u>Id.</u> Although a tint meter reading would be valuable in <u>proving</u> a window tint violation, a stop is constitutionally reasonable if there is probable cause to believe a violation has occurred. <u>See</u>

id. The violation may be proven through the testimony of the officer making the stop, even without a tint meter reading.

Based on the foregoing, the undersigned finds that the initial stop of the Vehicle was lawful.

### C. Duration and Scope of the Traffic Stop

Defendant next argues that the duration of the traffic stop was impermissibly extended, and the canine sniff exceeded the scope of the traffic stop. Motion at 5-7. "[A]n officer's investigation of a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20); see also Ramirez, 476 F.3d at 1236. "The stop may not last any longer than necessary to process the traffic violation unless there is an articulable suspicion of other illegal activity." Boyce, 351 F.3d at 1106 (quoting Purcell, 236 F.3d at 1278). The law enforcement officer making the stop may nevertheless "'investigate the driver's license and the vehicle registration,'" which may be done by "'requesting a computer check.'" Boyce, 351 F.3d at 1106 (quoting Purcell, 236 F.3d at 1278). In addition, a law enforcement officer may prolong a traffic stop "to await the results of a [routine] criminal history check so long as the detention does not take an unreasonably long time." Boyce, 351 F.3d at 1106-07 (quoting Purcell, 236 F.3d at 1278). "Reasonableness is measured by examining the totality of the circumstances." Purcell, 236 F.3d at 1279 (citations omitted). "Rigid time limitations and bright-line rules are generally inappropriate." Id. (citations omitted).

Here, Deputy Martin contacted Deputy Tolbert on Nextel before the Vehicle came to a stop. Deputy Tolbert arrived at the scene within minutes after he received the call from Deputy Martin. Shortly after Deputy Tolbert arrived at the scene, he called Deputy Gazdick to request a sniff. Deputy Gazdick arrived with canine Aron to conduct the sniff approximately four to five minutes thereafter, while Deputy Martin was conducting the computer checks and issuing the citation. Deputy Martin testified that approximately fifteen minutes elapsed from the initial stop of the Vehicle to the issuance of the warning citation.[25] Based on the testimony of Deputy Martin, Deputy Tolbert, and Deputy Gazdick, the undersigned finds that the sniff of the Vehicle was conducted before Deputy Martin completed routine computer checks and issued the warning citation. The duration of the stop was not impermissibly prolonged.

In addition, the undersigned finds no merit in Defendant's argument that the officers were "working the system" through their knowledge of the law in this area and their use of Nextel. That the officers were familiar with the law regarding window tint violations and the permissible duration and scope of a traffic stop for such a violation is obviously an improper basis for suppression. In addition, there is no evidence that the officers were using Nextel rather than the police radio for the nefarious purpose of violating Defendant's constitutional rights. To the contrary, the undersigned credits the testimony of Deputy Tolbert, who

---

[25] Even according to Defendant's version of events, the sniff was conducted no more than twenty-five minutes after the initial stop. Although Defendant testified that his driver's license was returned to him well before Deputy Gazdick arrived with the canine, Deputy Martin did not share this recollection. The time at which Defendant's driver's license was returned to him is not determinative of whether Defendant was free to leave because Deputy Martin was still issuing a warning citation for the window tinting. Regardless of when Defendant's driver's license was returned to him, additional time would have been required to issue the citation.

explained that communicating by Nextel is more convenient and is not susceptible to being monitored by the public at large.[26]

Furthermore, a sniff of the exterior of a vehicle by a properly trained canine "generally does not implicate legitimate privacy interests." Illinois v. Caballes, 543 U.S. 405, 409 (2005). Thus, law enforcement officers may conduct a dog sniff performed on the exterior of a vehicle while the vehicle is lawfully seized for a traffic violation even without a reasonable suspicion that the vehicle contains contraband. See Caballes, 543 U.S. at 409; see also United States v. Leal, No. 3:03-cr-31-J-32HTS, 2003 WL 21665126 (M.D. Fla. March 28, 2003) (unpublished). The sniff here was conducted while the Vehicle was lawfully seized. Deputy Martin was still conducting routine computer checks and issuing the warning citation for the window tinting violation when the sniff was conducted, and the stop was not impermissibly prolonged. Therefore, the sniff was not unlawful. See Caballes, 543 U.S. at 409.

### D. Probable Cause to Search the Vehicle Pursuant to the Automobile Exception

Defendant argues that the search of the Vehicle was not conducted pursuant to a warrant and was not supported by probable cause. See Motion at 4-5. Generally, the Fourth Amendment requires law enforcement officers to obtain a warrant before conducting a search. Maryland v. Dyson, 527 U.S. 465, 466 (1999). However, there is an exception to the warrant requirement for automobiles because their mobility makes obtaining a search warrant impracticable. See United States v. Ross, 456 U.S. 798, 806-07 (1982); see also Dyson, 527 U.S. at 466-67; Carroll v. United States, 267 U.S. 132, 153-54 (1925). "Under

---

[26] Defendant contends that the stop was impermissibly prolonged because Deputy Martin did not have a tint meter and waited for one to arrive. The undersigned has already found as a factual matter that Deputy Martin did have a tint meter with him at the time of the stop. See supra pp. 18-19, 21-22.

the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime." United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006); see also United States v. Lindsey, 482 F.3d 1285 (11th Cir. 2007). When the automobile exception applies, police officers may conduct a search of the vehicle that is as thorough as could be authorized in a warrant particularly describing the place to be searched. Ross, 456 U.S. at 800, 823-24 (internal quotation and citation omitted).

Here, the Vehicle driven by Defendant was mobile and operational. Therefore, the first requirement of the automobile exception is satisfied. As to the second requirement of the automobile exception, Defendant argues in the Motion that the positive alert of the canine did not establish probable cause because the reliability of the canine in detecting narcotics had not been established. See Motion at 4-5. However, during the suppression hearing, the parties stipulated that the canine was properly trained and had been deployed in a proper manner. Therefore, the undersigned finds that the narcotic-detection canine Aron was reliable. Probable cause to believe the Vehicle contained contraband was established by the narcotic-detection canine's positive alert signal. See United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) (citing United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (stating that the Eleventh Circuit "has recognized that probable cause arises when a drug-trained canine alerts to drugs")). Because the positive alert established probable cause to believe the Vehicle contained contraband, the search of the Vehicle was proper under the automobile exception to the warrant requirement.

## V. Conclusion

In accordance with the foregoing, it is

**RECOMMENDED:**

That the Motion to Suppress and Citation of Authority (Doc. No. 68) be **DENIED.**

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on February 2, 2010.

*James R. Klindt*
**JAMES R. KLINDT**
United States Magistrate Judge

jdf
Copies to:

Honorable Marcia Morales Howard,
United States District Judge

Assistant U.S. Attorney (Duva)

Wade M. Rolle, Esquire